Thomas L. NOWLAND, Jr. and Irene P. Nowland, Plaintiffs,

v.

SHOE CORPORATION OF AMERICA, an Ohio Corporation, trading as Wilmington Dry Goods Co. and Whitelight Industries, Inc., also known as and/or trading as White Metal Rolling & Stamping Corporation, Defendants.

Civ. A. No. 3538.

United States District Court
D. Delaware.

April 23, 1969.

Robert K. Payson, of Potter Anderson & Corroon, Wilmington, Del., for plaintiffs.

James F. Kipp, Wilmington, Del., for defendants.

## OPINION

LAYTON, District Judge.

Invoking the diversity jurisdiction of this Court, pursuant to 28 U.S.C. § 1332, § 1391(a), plaintiffs Thomas L. Nowland and Irene P. Nowland, both Delawareans, brought suit to recover money damages from Whitelight Industries, Inc., (Whitelight) a corporation of a state other than Delaware, and Shoe Corporation of America, an Ohio corporation trading in Delaware as Wilmington Dry Goods Company.[1] The gravamen of the plaintiffs' suit was that they were injured and that they suffered damages when Mr. Nowland fell from a ladder which had been purchased at Wilmington Dry Goods Company and which ladder had been manufactured by Whitelight Industries. The case was tried before a jury in December, 1968. The jury returned a verdict finding Whitelight liable to the plaintiffs, and Wilmington Dry Goods not liable. The jury awarded damages to Mr. Nowland of $25,000 and further found that Mrs. Nowland had suffered no loss of consortium.

As against the defendant Whitelight, the plaintiffs contended that Mr. Nowland was using the ladder in question on the evening of June 12, 1967, to paint his garage when, through no fault of his, the ladder collapsed causing him to fall to the ground, resulting in serious injury to his ankle. According to the plaintiffs, the accident occurred, inter alia, because Whitelight Industries negligently designed, or manufactured, the ladder.

Following the entry of judgment, the defendant Whitelight filed a motion for a new trial on several grounds: (1) that the Court erred in failing to grant Whitelight's motion for a directed verdict at the close of the plaintiffs' case, (2) that the verdict is against the weight of the evidence and (3) that the verdict is excessive.

At trial, after defendant Whitelight's motion for a directed verdict was denied, Whitelight proceeded to introduce evidence. The motion was not renewed at the close of all of the evidence. Whitelight concedes, as it must, that because it did not renew its motion at the close of all of the evidence, it cannot now seek a judgment, notwithstanding the verdict. Rule 50(b) F.R.Civ.P. However, implicit in Whitelight's first ground for a new trial is the contention that its failure to renew the motion is not a bar to assigning as error the court's failure to grant a directed verdict at the close of the plaintiffs' case. Plaintiffs do not challenge the defendant's right to seek a new trial on this ground. Instead, plaintiffs confine their reply to the merits of the defendant's contention.

In Gebhardt v. Wilson Freight Forwarding Company, 348 F.2d 129, 132 (3rd Cir., 1965), the Court of Appeals for this Circuit ruled:

"that the introduction of evidence after the denial of a motion for directed verdict constitutes a waiver of the error, if any, in the denial unless the motion is renewed at the close of all the evidence."[2]

■ Accordingly, I hold that the defendant's first ground for the granting

1. The principal place of business of each of the corporate defendants is outside the State of Delaware.

2. This rule was reaffirmed in Beebe v. Highland Tank & Manufacturing Company, 373 F.2d 886, 888 (3rd Cir., 1967), cert. den. National Molasses Co. v. Beebe, 388 U.S. 911, 87 S.Ct. 2115, 18 L.Ed. 2d 1350 (1967).

of a new trial cannot be urged. However, were the contention properly before the Court, it would be rejected as lacking merit for the reasons which follow.

■ · In determining whether the defendant Whitelight was entitled to a directed verdict, the focus of the inquiry is whether the plaintiffs presented a *prima facie* case against the defendant, in light of the facts and the reasonable inferences to be drawn therefrom.[3]

The plaintiffs' evidence showed that Mrs. Nowland purchased the ladder in question from Wilmington Dry Goods Company at the request and direction of her husband. It is undisputed that Whitelight Industries had manufactured the ladder. Prior to the accident, Mr. Nowland had used the ladder for five or six hours over the course of several days, on which occasions nothing unusual had happened. On the day of the accident, Mr. Nowland set the ladder on a level grassy surface with the rear legs braced against a block at the base of the garage. After putting a gallon can of paint on the perch, Mr. Nowland climbed to the fourth rung of the ladder and situated himself so that he was standing in the center of the fourth step with his legs resting against the fifth step. Then, as he reached forward to apply some paint to the garage, the right rear leg of the ladder gave way. The ladder pivoted on the left rear leg and fell; Mr. Nowland's leg was caught between the rungs, and his ankle was broken.

From this evidence, the jury could reasonably have found that the ladder was being properly used at the time of the accident and that the ladder failed, resulting in injury to Mr. Nowland.

To establish negligence in manufacture or design, the plaintiffs called two experts, one a metallurgist, Dr. Greenfield, and the other a structural engineer, Dr. Vinson. The sum of the metallurgist's testimony was that at the point of the fracture on the right rear leg of the ladder, the manufacturer had located a hole, from which the fracture appeared to propagate. By examining and testing the alloy at a point as close as possible to the fracture, the metallurgist concluded that the metal had an ultimate tensile strength of 35,600 p. s. i.[4] Further, he testified that while he could not measure the diameter of the hole because it was severely damaged in the accident, he was able to measure an adjacent hole which appeared to him to be substantially similar to the hole in question. He testified that the adjacent hole had a diameter of .261 inches. In addition, the metallurgist measured the diameter of a "squeeze rivet" which had been in the hole at the fracture site and found that its diameter was between .262 and .264 inches. Dr. Greenfield also testified that in his opinion this squeeze rivet put stress on the adjacent material, that the hole was subject to expanding as the rivet expanded, and that the diameter of the rivet shank was larger than the hole into which it had been put.

The structural engineer, Dr. Vinson, testified that he too was unable to measure the hole at the point of fracture but that he was able to measure an adjacent

3. Although neither of the parties addressed itself to the issue, there is a question of whether federal or state law governs the *quantum of proof* required to submit an issue to the jury. See Judge Aldisert's discussion of the issue in Denneny v. Siegel et al., 407 F.2d 433 (3rd Cir., 1969).
The text reflects the Delaware rule. Ebersole v. Lowengrub, 208 A.2d 495 (Del., 1965) ; Hyman Reiver & Company v. Merlonghi, 236 A.2d 367 (Del., 1967). The federal rule is as stated in the text with the addition that the facts and inferences are to be considered in the light most favorable to the plaintiff. Denneny v. Siegel, supra. In the circumstances of this case, I am not called upon to distinguish between the rules and, therefore, will not attempt to resolve the *Erie* issue discussed in Denneny.

4. The maximum force in pounds per square inch that the metal can withstand before failing.

hole, the diameter of which measured .261 inches. He measured the squeeze rivet, described above, and found its diameter to be between .262 inches and .264 inches. Dr. Vinson then posed a series of hypothetical situations, one of which assumed a 190 lb. man standing stationary on the fourth rung of the ladder, evenly balanced in the center, and standing erect. Under these conditions, which the defendant concedes to be consistent with the known facts, the stress at the critical point on the ladder would have been 14,620 p. s. i. Recalling that the ultimate tensile strength of the metal alloy was 35,600 p. s. i., Dr. Vinson calculated that an additional 20,000 p. s. i. to 21,000 p. s. i. would have caused the ladder to fail. Dr. Vinson then testified that the force of the squeeze rivet barrelling outward against the hole would have increased the stress at the hole sufficiently to cause a failure if the rivet had exerted sufficient pressure so as to increase the radius of the hole between .0005 and .0015 inches. Returning to the hole and rivet measurements, Dr. Vinson concluded that if the hole in question were originally .261 inches in diameter, as its neighbor measured, the rivet which measured .262 to .264 inches would have expanded the radius of the hole between .0005 and .0015 inches, which would have resulted in the accumulative stress exceeding 35,600 p. s. i.

In its reply brief, the defendant concedes that the testimony just narrated would be sufficient to make out a *prima facie* case against the defendant Whitelight[5] if the evidence supports the fact that the rivet in question actually expanded the hole at the fracture point so as to cause an increased stress of 21,000 p. s. i. The defendant attacks the suf-

ficiency of the plaintiffs' evidence arguing that the plaintiffs' experts had to assume that an adjacent, or neighboring, hole was originally the same size as the hole in issue. Defendant urges that the assumption of this critical fact is not legally permissible. I cannot agree.

Both experts called by the plaintiffs independently determined that the hole at the site of the fracture and its neighbor were sufficiently similar to justify comparison. The experts examined and analyzed the ladder. Photographs of the hole were enlarged to permit detailed scrutiny. And further, the defendant's cross examination in nowise attacked this determination by plaintiffs' experts. The evidence presented also showed that the rivet had put stress on the hole and that the hole was subject to expansion as the rivet expanded. I cannot say that as a matter of law the experts' assumption that the holes were originally of the same diameter was impermissible nor can I say that a jury could not reasonably infer that the squeeze rivet exerted sufficient force to increase the stress at the point of fracture so that the cumulative stress exceeded the ultimate tensile strength of the alloy.

■ According, I am of the view that the jury could have reasonably concluded from the testimony of the experts that the failure of the ladder was due to negligent design and manufacture by Whitelight. More especially, they could have found at the close of the plaintiffs' case that the ladder was designed and manufactured so that under proper usage by this plaintiff, the stresses would exceed the ultimate tensile strength of the aluminum alloy used.

---

5. In its opening brief, the defendant contended that the plaintiffs had failed to prove causation because, as plaintiffs' expert, Dr. Vinson, admitted, it was impossible to establish by looking at the ladder after the accident which defects caused the accident and which were caused by the accident. Whether or not the conces-

sion in the reply brief implies that the defendant had abandoned this position, I find the contention without merit. As the plaintiffs properly point out, Mr. Nowland's testimony is sufficient to permit the jury to conclude that the break in the right rear leg of the ladder precipitated the accident.

■ Defendant's second ground for a new trial is that the verdict is against the weight of the evidence. As the parties recognize in their briefs, this phase of the defendant's motion is addressed to the sound discretion of the Court, in the exercise of which the Court may weigh the evidence and order a new trial where the verdict is against the clear weight of the evidence. Silverii v. Kramer, 314 F. 2d 407 (3rd Cir., 1963), Moore's Federal Practice, Volume 6A, ¶ 59.08 [5].[6]

■ In support of this phase of its motion, the defendant repeats, insofar as they are appropriate, the contentions made above. Based upon my discussion of these contentions, I cannot say that the plaintiff's evidence is legally insufficient to support the verdict returned on the grounds suggested. To these arguments the defendant adds its contentions that (1) the accident could not have happened as Mr. Nowland testified, (2) the rivet could not have expanded the hole at the fracture point, and (3) the manufacture and design of the ladder were in nowise negligent.

Defendant's argument that the accident could not have happened as Mr. Nowland related is that the plaintiff would not have fallen to the left when the right rear leg gave way and, further, that with the rear legs braced against the garage, it is impossible for the right rear leg to have been bent outwards, as it appears to have been, because it would have been blocked by the garage wall. In rebuttal, the plaintiffs' experts testified that while the ladder would begin to fall to the right, it is reasonable to postulate that Mr. Nowland reversed his motion and caused the ladder to pivot, falling to the left, and away from the garage, as the plaintiff stated. Not to be overlooked is plaintiff's testimony that once the ladder began to fall, he understandably cannot describe the course of the fall with precision.

To be sure, the plaintiffs' evidence is not without the inconsistencies that seem almost inherent in attempts to recollect and reconstruct a sudden happening. However, the defendant has not proven more. Significantly, the defendant has not proven that the accident could not, or that it did not, happen as Mr. Nowland testified.

Defendant's second contention is that the rivet could not have expanded the hole so as to increase the cumulative stress at the point of the fracture beyond the ultimate tensile strength of the metal. Defendant predicates its argument on the testimony of Mr. Records, defendant's chief engineer, that a stamping device was used to punch all the rivet holes on the ladder to .265 inches in diameter. Because the rivet taken from the hole in question measured at maximum .264 inches in diameter, defendant submits it could not have expanded the hole. Perhaps, the defendant proves too much. By measurement, uncontradicted by the defendant, the plaintiffs' experts found at least one rivet hole on the ladder involved in the accident significantly smaller than .265 inches in diameter. Is it not as likely that the holes on the Nowland ladder were uniform at .261 inches in diameter as that the hole measured was unrepresentative? At the least, defendant's proof hardly compels the conclusion that the rivet did not expand the radius of the hole at the fracture by .0005 inches, as plaintiffs suggest.

In support of its third contention, that the defendant was not negligent in the manufacture and design of the ladder, defendant points to the record evidence that a prototype of the ladder was tested in accordance with the American Standards Society Safety Code for Portable Metal Ladders, and that the ladder's prototype performed satisfactorily loaded at the top with an 800 pound weight. Defendant's evidence, while implicitly in

6. Lind v. Schenley Industries, Inc., 278 F.2d 79 (3rd Cir., 1960) cert. den., 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).

conflict with the tenor of plaintiffs' evidence, is not so prohibitive as to substantially negate plaintiffs' proof.

In sum, whether considered separately, or cumulatively, I am not persuaded that the defendant's contentions show the verdict to be against the weight of the evidence.

Lastly, the defendant contends that the verdict is excessive. This phase of the defendant's motion is also committed to the sound discretion of the Court, which discretion will be exercised to prevent injustice, but not to substitute the judgment of the Court for that of the jury. Wooley v. Great Atlantic and Pacific Tea Company, 281 F.2d 78 (3rd Cir., 1960), Moore's Federal Practice, Volume 6A, ¶ 59.08 [6].

By way of damages, the plaintiffs established that Mr. Nowland had lost $2011.59 in wages, that he had lost the opportunity to earn some $977.00 in overtime, that his out-of-pocket medical expenses were $675.00 and that his injuries were permanent. Also, the evidence showed that it is likely that Mr. Nowland will require a future operation[7] which will result in additional lost wages, medical expenses and in a more severe permanent physical disability. Further, the plaintiffs showed that Mr. Nowland had been in a full leg cast for a period of some twelve weeks and that his ankle, though healed, was still painful on occasion, thus limiting his social and recreational activities.

No exceptions were taken to the instructions on computing damages and I cannot say that the jury did not follow the instructions or that their determination was so unreasonable as to "shock the judicial conscience." Wooley v. Great Atlantic and Pacific Tea Company, supra. Additional evidence that the jury was not swayed by sympathy or otherwise improperly influenced is the fact that the jury non-suited Mrs. Nowland in her claim for damages arising from loss of consortium.

For the reasons stated, the defendant's motion for a new trial will be denied.

Submit order.

---

7. The future operation forecasted is an ankle fusion which will permanently limit the movement of the plaintiff's right foot from the ankle. The defendant estimates the "future special damages" at $4000.00.