**Esker E. HASKINS, Appellant,**

v.

**POINT TOWING CO., and M/V H. E. BOWLES, a motor vessel, her boilers, engines, tackle apparel and furniture, and Bulk Towing, Inc., in a cause of contract and damage, civil and maritime.**

**No. 17801.**

United States Court of Appeals
Third Circuit.

Argued Sept. 23, 1969.

Decided Jan. 21, 1970.

Harry Alan Sherman, Pittsburgh, Pa., for appellant.

Donald L. Very, Campbell, Thomas & Burke, Pittsburgh, Pa. (Charles E. Lugenbuhl, Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., on the brief), for appellees.

Before HASTIE, Chief Judge, and Mc-LAUGHLIN and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This case is before the court on a second appeal which was taken from an order granting defendant's motion for summary judgment. Plaintiff-appellant Haskins initiated this action by filing a Libel in Admiralty in the District Court for the Western District of Pennsylvania against the appellee, Point Towing Co., the motor vessel H. E. Bowles, and Bulk Towing, Inc. In his "First Cause of Action" plaintiff sought recovery for personal injuries sustained in a fall on November 28, 1964, while going ashore on ship's business on the alternative grounds of unseaworthiness and negligence under the Jones Act, 46 U.S.C. § 688. In the "Second Cause of Action," he sought recovery for maintenance and cure allegedly due as a result of the above accident. Haskins demanded a trial by jury. The injuries of which he complained allegedly occurred while he was serving as a crew member on the motor

vessel Bowles. Process issued but was returned unserved as to Bulk Towing, Inc., an Ohio corporation, which was therefore dropped out of the case. After the case removed from the jury list, the case was tried to the court and, after hearing, plaintiff's claims were dismissed.

On appeal, this court reversed,[1] solely on the grounds that Haskins had been entitled to a jury trial, but in so doing the court noted:

"On remand the district court should * * * afford defendant an opportunity by appropriate motion to raise the question of the sufficiency of the evidence as a matter of law to make out a case for consideration by a jury. If the court finds the evidence inadequate for that purpose a judgment for the defendant as a matter of law will be appropriate; * * *." 395 F.2d at 743.

On remand, the District Court granted Point Towing Co.'s motion for summary judgment, ruling that the evidence conclusively established that Point Towing Co. was not Haskins' employer nor did it control the motor vessel Bowles at the time of the accident. It is Haskins' appeal from this judgment which is before us now.

A brief summary of the testimony, considered in the light favorable to plaintiff, which is relevant to our determination of the issues on appeal, is pertinent. In early 1962 the "H. E. Bowles" was acquired by Point Towing Co. for the purpose of charter to Bulk Towing, Inc., which company was to operate it for towing of barges from South Charleston, West Virginia, under contract with Union Carbide Company. At that time a contract, dated February 1, 1962, was entered into between Point Towing Co. and Bulk Towing, Inc. for the bareboat charter of the Bowles by the latter (Exhibit G and N.T. 285). This arrangement continued through November 1964, when the Bowles was still operating under contract between Union Carbide and Bulk Towing, Inc. to tow barges from South Charleston, West Virginia (54 miles from the Ohio River, N.T. 208), via the Kanauga and Ohio Rivers (N.T. 218).

Haskins was employed for 11 months prior to the November 1964 accident and during that period he served only aboard the M/V H. E. Bowles as Second Engineer. He testified that the Chief Engineer of the Bowles told him at the time he was hired that he wanted Haskins to work for Point Towing Co.[2] The pay checks issued Haskins during his employment had the name "Bulk Towing, Inc." imprinted on them but they were delivered in an envelope with "Point

---

1. See Haskins v. Point Towing Co., 395 F.2d 737 (3rd Cir. 1968), which gives the past history of this litigation.

2. At trial Haskins testified as follows:
"Q. Tell us what arrangements were made to come up to be a river man and for whom?
A. Well, his other engineer died, of course, with a heart attack. He couldn't find anyone rightaway. He come to me, and he wanted me to work with him.
Q. For who?
A. For the Point Towing Company."
(N.T. 13–14).
Prior testimony reveals that Haskins was speaking of the Chief Engineer on the Bowles, one Clyde Robinson. However, there is no evidence that the Chief Engineer had any authority either to employ for, or make admissions concerning employment binding on, Point Towing Co.

In fact, the record shows employment was handled by Mr. Bosworth or others in the office such as Mr. Bowles (N.T. 207). Also, Haskins testified:
"Q. At the time you were hired by Mr. Robinson or contacted by him to work on the Bowles, did he tell you who owned the boat?
A. Yes, sir.
Q. What did he say?
A. Point Towing Company.
Q. Did he tell you who was operating the boat?
A. Yes, sir.
Q. What did he say?
A. Mr. Bosworth.
* * * * *
Q. Did he say that Bulk Towing Company was operating the boat?
A. No, sir; not that I recall." (N.T. 75).

Towing Co., as return addressee. Haskins endorsed at least two pay checks made out to him on printed checks of Bulk Towing, Inc. (N.T. 87–88) and his wife endorsed most of his pay checks. The only other members of the crew (one called to the stand by plaintiff) who testified (Bryan, relief Captain, N.T. 218; Simpkins, Captain, N.T. 295; and Arnott, deckhand, N.T. 301) were employed and paid by Bulk Towing, Inc. on November 28, 1964. The time sheets which Haskins signed had the name "Bulk Towing, Inc." on them. Haskins testified that he was unable to read and was capable of signing only his own name. Haskins signed a statement two days after the accident while in the hospital which indicated, inter alia, that his employer was Bulk Towing, Inc. He testified that he was told to sign the statement or risk not being paid at the time. Also, when examined by his doctor shortly before the trial (February 1967),

plaintiff may have stated that he "is employed by the Point Towing Company, second engineer" (N.T. 122).[3]

### *The Jones Act Claim and the Claim for Maintenance and Cure*

■■ In view of the foregoing evidence (particularly Exhibits A, B and G), we can find no reversible error in the District Court's conclusion that "the entire record and the evidence presented with respect to libellant's employment and Point Towing Company's alleged control of the vessel would have compelled the granting of a motion for directed verdict as to Point Towing Company." At the most, the jury would have been entitled to find that plaintiff thought he was employed by Point Towing Company,[4] as opposed to the overwhelming evidence that he was in fact employed by and on the business of Bulk Towing, Inc. See Welsh v. Utah Dredging Co., 403 F.2d 217 (3rd Cir. 1968);[5] Hill v. Dia-

---

3. It is quite possible that Haskins' lawyer told the doctor that Point Towing Co. was the employer and hence this testimony by the doctor seems of very little, if any, significance.

4. Since plaintiff has a pending suit against Bulk Towing, Inc. in an Ohio District Court, there has been no showing of reliance by him to his detriment on Robinson's alleged statement.

5. In *Welsh*, the seaman's written employment contract for work in Japanese waters with a Japanese corporation provided: "Contractor may require employee to perform work * * * for individuals or companies associated with Contractor on the same project, * * *" and "The Contractor may assign this Agreement to, or may require the employee to render services for, Utah-Ishiyama, a Joint Venture" (Sections 1–C and 13 of Exhibit D–1). At the time the seaman signed this contract in October 1961 in the San Francisco office of Utah Construction and Mining Company (hereinafter "Utah Construction"), that company's office manager said to him "we got a joint venture going" (N.T. 136). Utah Construction and a Utah subsidiary had previously employed the seaman and had paid his expenses to the west coast after he had applied for work on the Japan Dredging Project to its east coast employment su-

pervisor (Mr. Peterson). The Japanese corporation was wholly owned by Utah Construction in October 1961, but in early 1962, before the injury, 50% of its stock was sold to a Japanese company different from such Japanese corporation. Although Utah Construction, as possessor of the vessel (on which the seaman worked at the time of his 1962 injury in Japanese waters) under a lease, had entered into a bareboat charter of such vessel to the Japanese corporation, there was no evidence that the seaman knew of this bareboat charter. All the correspondence sent to the seaman showed Utah Construction as return addressee. The office in San Francisco had Utah Construction's name on it. When he arrived at his destination in Japan, the seaman was met by Mr. Peterson and another person with whom he had previously worked while employed by Utah Construction. When the seaman returned from Japan, he again reported to the Utah Construction's office in San Francisco and the same office manager arranged lodging and medical treatment for him. In settling Welsh's injury claim, the office manager utilized Utah Construction's stationery.

The evidence offered by the seaman and the record in his case are similar in these respects, among others, to that presented by Haskins:

mond, 311 F.2d 789 (4th Cir. 1962); cf. Gatenby v. Altoona Aviation Corporation, 407 F.2d 443 (3rd Cir. 1969); Denneny ·v. Siegel, 407 F.2d 433 (3rd Cir. 1969).

A primary prerequisite to any recovery under the statutory scheme of compensation provided by the Jones Act, 46 U.S.C. § 688 (1964), is the establishment by the seaman of an employer-employee relationship with the defendant. Rights given under the Act are an outgrowth of the peculiar condition of a seaman's employment. Paul v. United States, 205 F.2d 38 (3rd Cir.), cert. den. 346 U.S. 888, 74 S.Ct. 140, 98 L.Ed. 392 (1953). The same applies to rights arising under the older common law doctrine of maintenance and cure. See Cortes v. Baltimore Insular Line, 287 U.S. 367, 371, 53 S.Ct. 173, 77 L.Ed. 368 (1932); 1 Norris Law of Seamen, § 543 (2nd Ed., 1962).

### The Unseaworthiness Claim

 We affirm the judgment for defendant on this claim as well, since the record requires the conclusion that the vessel had been under bareboat charter to Bulk Towing, Inc. since February 1962, and there is no evidence that any unseaworthiness of the vessel existed at that time. Initially, it may be observed that the construction of a contract is a question of law for the court to decide,

Seaboldt v. Pennsylvania Railroad Company, 290 F.2d 296 (3rd Cir. 1961), and when clear and unambiguous language is at issue, it is reversible error to leave such questions for the jury. Jamison v. A. M. Byers Company, 330 F.2d 657 (3rd Cir.), cert. den. 379 U.S. 839, 85 S.Ct. 74, 13 L.Ed.2d 45 (1964). Here a written contract, represented by a letter agreement (Exhibit G) signed by officers of both corporations, prefaced terms of a charter arrangement with the following language:

"The following items confirm the discussion of charter arrangements of the M/V H. E. Bowles on a bare boat basis to Bulk Towing, Inc."

Since nothing in the letter indicates that Point Towing Co. was to maintain any control over the vessel inconsistent with the accepted meaning of a "bare boat" charter and there is no evidence that the vessel was unseaworthy when control shifted to Bulk Towing, Inc., the record [6] indicates only that Bulk Towing, Inc., and not Point Towing Co., had the requisite control of the vessel at the time of the accident necessary to premise liability for unseaworthiness. See Cannella v. Lykes Bros. S. S. Co., 174 F.2d 794 (2nd Cir.), cert. den. 338 U.S. 859, 70 S.Ct. 102, 94 L.Ed. 526 (1949); Vitozi

1. There is evidence that an employee of Utah Construction (Mr. Peterson) told the seaman he would like him to "go to Japan with Utah Construction". This is similar to Haskins' testimony about Robinson's statement in *Haskins*, but in *Welsh* it was conceded that Peterson had authority to hire the seaman and had done so previously.

2. There is evidence that correspondence with the seaman contained the Utah Construction's name on the top of the letters, whereas such name was only shown as return addressee on some envelopes containing pay checks in *Haskins*.

3. There is evidence that the business of the Japanese corporate employer was carried on from the offices of the defendant.

4. There is a signed writing stating that someone other than a defendant was the employer in the *Welsh* case, but providing for alternate employers particularly as respects a joint venture, whereas the signed time sheets showing Bulk Towing Co. as employer of Haskins showed no alternate employer. Welsh attempted to explain this by referring to the conversation about joint venture (see quote above), while Haskins claimed inability to read.

5. Neither man apparently knew of the bareboat charter.

6. In both cases, a verdict was directed for the defendant at the close of all the evidence.

Also, it is noted that the trial judge in *Welsh* repeatedly sustained objections to questions aimed at determining for whom Welsh thought he was working.

6. Captain Bryan testified that the Bowles was being operated by Bulk Towing in doing work for Union Carbide at that time (N.T. 218). See, also, testimony of Mr. Bosworth at N.T. 282.

v. Balboa Shipping Co., 163 F.2d 286 (1st Cir. 1947). Also, the record clearly establishes that O-Kan Harbor, Inc., and not the Point Towing Co., was responsible for the conditions existent at the landing where Haskins was injured. The note that a dock owner in the factual context presented by this record cannot be charged with unseaworthiness but any such claim must be made against the owner of the ship from which the seaman is alighting. See Daniels v. Florida Power & Light Company, 317 F.2d 41 (5th Cir.), cert. den. 375 U.S. 832, 84 S.Ct. 78, 11 L.Ed.2d 63 (1963).

After a careful consideration of plaintiff's contention that the separate corporate entity of Bulk Towing, Inc. should be disregarded or that it should be treated as the agent of Point Towing Co., we have concluded that the record [7] requires affirmance of the District Court's conclusion that there has been no showing justifying the disregard of the separate corporate entities of Point Towing Co., Bulk Towing, Inc., and O-Kan Harbor, Inc. in this case. See Zubik v. Zubik, 384 F.2d 267 (3rd Cir. 1967), cert. den. 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968).

For the reasons stated above, the District Court's order of December 26, 1968, will be affirmed.

McLAUGHLIN, Circuit Judge (dissenting).

In approaching these seamen actions, the words of Mr. Justice Story (sitting as Circuit Justice) should always be very much in mind:

"Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; * * * because they are credulous and complying; and are easily overreached." Harden v. Gordon et al., 11 Fed.Cas., pp. 480, 485 (No. 6,047) (C.C.Me. 1823).

In connection therewith, and under the circumstances of this case, the right judicial approach was suggested recently by Archibald Cox in a tribute to former Chief Justice Warren. Professor Cox wrote:

"Increasingly often * * * lawyers at the bar found that arguments based upon precedent, accepted legal doctrine, and long range institutional concepts * * * foundered upon Chief Justice Warren's persistent questions, 'Is that fair?' " Cox, "Chief Justice Earl Warren," 83 Harv.L.Rev., 1, 2 (1969).

So too here, the majority view, I respectfully submit, does not pass the test embodied in the question, "Is this fair?" To the contrary, under the circumstances before us, depriving plaintiff of his merited jury trial is unequivocally unfair.

---

7. The record makes clear that the Point Towing Co., Bulk Towing, Inc., and O-Kan Harbor, Inc., all are operated as separate and distinct corporations (N.T. 271, 278–79, 292–93). T. L. Campbell and E. F. Smith were the original stockholders of Point Towing Co. when it was organized in the early 1950s (N.T. 273). By 1963, Robert Bosworth was President and a stockholder of that company and it owned several vessels, including the Bowles (N.T. 277). Bulk Towing, Inc. was organized in 1960 with Messrs. Bosworth, Campbell and Smith as the stockholders (N.T. 278). It had the same officers as Point Towing Co. in 1963 and 1964 (N.T. 278). Point Towing Co. owns a building near the O-Kan Harbor landing and its employees keep the books (the books of O-Kan Harbor, Inc. are kept in Mr. Bosworth's home—N.T. 279) of, and provide other services for, the above companies and make charges to Bulk Towing, Inc. and O-Kan Harbor, Inc. for such services (N.T. 281). O-Kan Harbor, Inc. operated the harbor and landing where the accident occurred, making charges to the many vessels using its facilities. The fact that at the time of trial in 1967 (as opposed to the time of the accident, or the time of service of process), Bosworth owned all the stock of Point Towing Co. and Bulk Towing, Inc. (see Stipulation, par. I) is not significant. Similarly, the fact that Bosworth is chief executive officer of all three corporations is not sufficient to justify a piercing of the separate corporate identities or a finding that these companies were mere agents of Bosworth.

This case, filed in 1965, was sent back to the trial court for a jury trial in May, 1968. Haskins v. Point Towing Company, 395 F.2d 737 (3 Cir. 1968). Yet appellant, who evidently was seriously injured and permanently disabled, has not yet had his proverbial day in court. Our remand, of course, soundly recognized that if defendant was entitled to a dismissal of the action as a matter of law, " * * * the district court should therefore afford defendant an opportunity by appropriate motion to raise the question of the sufficiency of the evidence * * * to make out a case for consideration by a jury." At 743. As I see it, the district court in granting defendant's motion for summary judgment clearly committed error.

A summary judgment motion must be denied unless " * * * There is no genuine issue as to any material fact * * *." Rule 56(c), Fed.R.Civ.P. 28 U.S.C.A. In this matter, instead of having before it just pleadings and depositions, etc., as is generally the case on summary judgment, the court below had the benefit of the transcript of the trial to the court previously held. Viewing the situation most favorably to appellant (then the opponent of the summary judgment motion), there was a genuine issue as to a material fact i. e. although certain records tended to indicate that Haskins was not an employee of Point Towing—the key issue since the matter of unseaworthiness and appellant's injury were established—Haskins testified that he *was* a Point Towing employee at the time of his unfortunate mishap. On summary judgment, the trial court should not have attempted to evaluate Haskins' testimony or judge his credibility. Those were jury issues.

Both the trial court and the majority assert that the recorded evidence with respect to appellant's employment would have, in a jury trial, compelled the granting of a motion for a directed verdict. I cannot agree. To the contrary, I would find no error in a jury's conclusion that Haskins' testimony that he was a Point Towing employee was more persuasive than evidence to the contrary. The suggestion that Haskins, an illiterate, only "thought" that he worked for Point Towing is unjustified. After all, William F. Bryan, "a pilot and captain" for Bosworth (the owner of the entire shipping enterprise involved) for four years and captain of the vessel on which appellant was Second Engineer at the time of the accident testified that he (Bryan) worked on several vessels during the course of his employment, and further testified that he was never informed as he was assigned to different vessels that he was changing employers (Tr. 207). As captain, he had the log books and time sheets for various vessels he worked on, unlike Haskins, which indicated his employer (Tr. 217). Nonetheless, despite the various Bosworth companies involved, the testimony clearly indicates that Bryan's basic employer was Bosworth:

"Q. You work(ed) (sic) for Mr. Bosworth?

A. Yes, sir.

Q. During what period?

A. From July 29, 1961 until June 1965.

Q. Now, do you remember, sir, the names of vessels that you worked on *while you were working with Mr. Bosworth?*

A. Yes, sir." (Tr. 203). (Emphasis supplied)

Likewise, although the majority indicates that there is no evidence that Chief Engineer Clyde Robinson had any authority to hire Haskins as Second Engineer for Point Towing, Haskins' testimony unmistakably indicates that he was persuaded by Robinson to give up his logging and sawmill business in Mississippi and to travel to Paducah, Kentucky, where he boarded the Bowles and commenced his employment with Point Towing; Robinson actually hired Haskins (Tr. 11–15; 72–76). He also testified that he was "pretty certain" that Point Towing was the employer's name listed on his income tax returns (Tr. 90).

The statement that Haskins signed in the hospital to the effect that he was employed by Bulk Towing does not change this to any degree. Admittedly Haskins was illiterate. He was still in great discomfort two days after his accident when the lawyer, John Epling, an attorney for the owner of Bulk Towing and Point Towing,[1] asked Haskins to sign a statement, which Haskins asserted was prepared in advance and not read to him. Tr. 174–178. That statement which contained language to the effect that Haskins was a Bulk Towing employee not only is suspect in this situation, but the whole incident surrounding its signing might well lead a jury to believe that there was an effort made to trick Haskins into signing a damaging statement, and in that light Haskins' testimony probably would be viewed with the utmost credibility by a jury.

All in all, the impact of the testimony is that bare-boat charter or not, separate corporate entity or not, there was sufficient disputed material evidence on the problem as to Haskins' employer to defeat the defendant's summary judgment motion. Regardless of which account Haskins' pay checks were drawn on, they were given to him, it is his contention, as a Point Towing employee in a Point Towing envelope. Haskins, by insisting that the factual employment question be passed upon by the triers of the fact, is not asking favors. He is simply asking that right be done by the trial of his claim according to the law of this land. In this connection it should be noted that examination of the alleged secret bare-boat charter, and separate corporate entities of the various segments of Bosworth's enterprise, does not compel the conclusion that the crews assigned to the various boats operated by Bosworth's various corporate entities did not work for Bosworth and his Point Towing Company. Certainly it does not make sense to dismiss the evidence that Haskins worked for Point Towing with the conclusory phrase that he only "thought" that he worked for Point Towing. And above all, on summary judgment, it was plainly erroneous to evaluate Haskins' testimony and credibility.

In its memorandum granting defendant's motion for summary judgment, the district court stated that " * * * It appears that the libellant's efforts to establish employment and control by Point Towing Company are designed primarily for the convenience of Pittsburgh counsel." Memorandum, Admir. No. 65–49 (dated Dec. 26, 1968). This comment would appear to be unwarranted for at least two reasons: First, we know from appellant's attorney that the case was forwarded to him by Chicago counsel. Thus it would seem that he did not even select the forum, but rather tried to properly handle the matter entrusted to him; Second, since Haskins himself maintained and testified that be was employed by Point Towing, a Pennsylvania corporation, the choice of forum does not appear to have been baseless.

Finally, counsel for the appellee urged affirmance on the basis of this Court's recent per curiam opinion in Welsh v. Utah Dredging Co., 403 F.2d 217 (3 Cir. 1968), and the majority adopted that view. Welsh is clearly distinguishable on its facts. The record in that decision plainly reveals that Welsh had actually signed an employment contract with a different firm than the defendant in that suit. Haskins, it must be admitted, never signed any employment contract.

For the reasons heretofore stated, I would remand, and order that the case be placed on the current jury trial calendar as this is a 1965 suit.

---

1. John Epling was also an incorporator of Balk Towing Company, Tr. 277.