Josephine Ann SLEEK, Appellant in
No. 14,166,

v.

J. C. PENNEY COMPANY, Inc., a Delaware Corporation, Appellant in
No. 14,167.

Nos. 14166, 14167.

United States Court of Appeals
Third Circuit.

Argued April 23, 1963.

Decided Nov. 13, 1963.

468

James P. McArdle, Pittsburgh, Pa. (Paul F. Laughlin, McArdle, Harrington & McLaughlin, Pittsburgh, Pa., on the brief), for Josephine Ann Sleek.

Bruce R. Martin, Pittsburgh, Pa. (Pringle, Bredin & Martin, Pittsburgh, Pa., on the brief), for J. C. Penney Co., Inc.

Before BIGGS, Chief Judge, and HASTIE and GANEY, Circuit Judges.

BIGGS, Chief Judge.

Jurisdiction in the case at bar is based on diversity of citizenship and, after a jury trial, the suit resulted in a judgment in favor of the plaintiff, Mrs. Josephine Ann Sleek, against the defendant, J. C. Penney Co., Inc., in the amount of $10,-000. Both parties have appealed. The plaintiff asserts that the amount of the jury's verdict was reduced because of the errors and the improper actions of the trial judge as set out hereinafter. The latter charge constitutes a most serious accusation. Penney insists that there was not sufficient evidence to support a verdict against it.[1]

1. The case was five years old when tried and, for reasons that will appear in the course of this opinion, there was no pretrial conference. No better example of the desirability of the pretrial conference can be found than the case at bar. It should be pointed out, however, that the court below, with very rare exceptions, has made a point of employing the technique of the pretrial conference, and indeed all pretrial techniques, and has by great energy and industry brought its docket up to date.

The complaint alleged that Mrs. Sleek was injured because Penney negligently permitted wrapping cord to gather on the floor of its store and this caused her to trip and fall. The following appears from the evidence offered by the plaintiff in her case in chief. On January 5, 1955, Mrs. Sleek, accompanied by her daughter, Mrs. DeFinis, her daughter-in-law, Mrs. Demor, and Mrs. DeFinis' daughter, Donna Jean Hughes, went to the Penney department store in Monroeville, Allegheny County, Pennsylvania. The purpose of this excursion was to purchase sheets at the Penney January "White Sale." While in the store, Mrs. DeFinis made a purchase, and as Mrs. Sleek was tabulating the sales slip for her, Mrs. Demor called to Mrs. Sleek from a point near a low platform or lowboy, described in the next paragraph. Mrs. Sleek testified that she turned to join her daughter-in-law and her right foot became entangled with something. This threw her off balance and after a futile attempt to regain her equilibrium, she fell heavily. After her fall she discovered wrapping cord on her shoe, which was the same as cord found in the aisle of the store, and was traced back to a spindle on or near a counter or platform.

Three of Penney's employees testified in its defense. All stated that there was a low platform or low-boy, perhaps five feet long, about five inches high and three to four feet broad, close to the spot where the plaintiff fell. One of these witnesses, Walker, testified that he heard a thud and that "[Mrs. Sleek] had stumbled over this lower platform. I had thought that was what it was. * * * There was nothing else that would have made a thud."

Despite the fact that the plaintiff had proceeded with her case in chief on the theory that her foot had become entangled in the defendant's wrapping cord, nonetheless at the close of the defendant's case the plaintiff sought to introduce a new theory of liability: i. e., that Penney was negligent in making use of the low platform or low-boy in such a

position that the plaintiff could fall over it. Her counsel moved to amend her complaint to conform to the evidence as provided by Rule 15(b), Fed.R.Civ.Proc., 28 U.S.C. This motion was refused and the plaintiff claims this constituted prejudicial error.

■ We cannot agree. Since this is a diversity case, we must look to the law of Pennsylvania to determine Penney's liability. Dill v. Scuka, 279 F.2d 145, 147 (3 Cir. 1960). Under Pennsylvania law the "jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture." Smith v. Bell Telephone Company of Pennsylvania, 397 Pa. 134, 138, 153 A.2d 477, 479 (1959). Even assuming that Walker's testimony, largely based on sound rather than sight, was sufficient, there was no evidence offered to show that the low-boy was improperly or negligently placed by Penney on the floor of the store. It is clear, therefore, that the court below committed no reversible error in rejecting the proffered amendment. See Stephens v. Reed, 121 F.2d 696, 699 (1941), in which this court said: "The court's refusal of these amendments was * * * not an abuse of discretion. There can be no abuse when what is refused would avail the offeror nothing if allowed."

The next point raised by the plaintiff is that the court below erred in refusing to admit certain expert medical evidence which the plaintiff insists would tend to prove that certain drugs, Flexin and Thoricin, prescribed for her by her doctors because of injuries resulting from her fall gave her hepatitis. According to the offer of testimony made by the plaintiff, it could have been shown that these drugs have been withdrawn from the market as causing this disease. The court refused to receive this evidence on the ground that it did not possess the certainty required by Pennsylvania evidentiary rules. See Wargo v. Pittsburgh Railways Co., 376 Pa. 168, 172–173, 101 A.2d 638, 640 (1954). The plaintiff's argument is based in part on Rule 43(a),

Fed.R.Civ.Proc.[2] She points out also that Section 597, Restatement, Conflict of Laws, states that "the law of the forum determines the admissibility of a particular piece of evidence," that the Supreme Court held in Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109, 80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959), a Jones Act case, that "[t]he matter [of sufficiency of expert testimony] does not turn on the use of a particular form of words by the physicians in giving their testimony," and finally, that this court has applied a seemingly equivalent rule in F. E. L. A. decisions. See Neff v. Pennsylvania R.R. Co., 7 F.R.D. 532, 534 (E.D.Pa.1948), affirmed, 173 F.2d 931 (3 Cir. 1949). She seeks to bolster her position in this, the case at bar, a diversity case, by citing as authority Carlson v. Chisholm-Moore Hoist Corp., 281 F.2d 766, 771–72 (1960), cert. denied, 364 U.S. 883, 81 S.Ct. 172, 5 L.Ed.2d 104 (1960), where the Court of Appeals for the Second Circuit, relying largely on Rule 43(a), allowed expert opinion evidence although the evidentiary rules of New York, in which the federal trial court sat, seemingly would have excluded it. But the offer of proof as to the cause of Mrs. Sleek's hepatitis was in our view insufficient under any rule to make it available in the case at bar. One doctor testified, for example, "to the possibility of indirect possibility" of the plaintiff's hepatitis being caused by the drugs. The strongest testimony on this issue was given by Dr. Maier Tuchler of Phoenix, Arizona, who was called by the plaintiff as an expert in the fields of neurology and psychiatry. He testified that the two drugs, Flexin and Thoricin, were "suspected" of causing hepatitis, but he also stated that there were two kinds of hepatitis, one caused by infection and the other by drug

reaction. The most that can be said for Dr. Tuchler's statements in this connection, on which the plaintiff's offer was based, was that she had parenchymal[3] hepatitis but, Dr. Tuchler went on to say that "you cannot determine which [type of hepatitis] is infectious and which is due to drug reaction."

■■ There was of course a possibility that the plaintiff's illness could have been caused by the administration of drugs but even under the most liberal construction of what the witnesses said whether the plaintiff's hepatitis was infectious or caused by drugs was left completely *in nubibus*. There was no offer to prove that it was not infectious hepatitis, i. e., caused by a non-sterile needle or perhaps by food organisms. In addition, there was no offer of testimony as to what the plaintiff's dosage of either drug had been and the matter was left in the area of speculation. We are still of the view that in a diversity case where the sufficiency of the evidence goes to the maintenance of the substantive right, as here, the law of the state must prevail. Moran v. Pittsburgh-Des Moines Steel Co., 166 F.2d 908, 917 (3 Cir. 1948), cert. denied, 334 U.S. 846, 68 S.Ct. 1516, 92 L.Ed. 1770 (1948); Waldron v. Aetna Casualty & Surety Co., 141 F.2d 230, 234 (3 Cir. 1944). There was lacking here not only the reasonable medical certainty required by the law of Pennsylvania but the offer of testimony possessed insufficient probative value to permit it to go to the jury even under the most general rule of admissibility. The trial court did not err in rejecting the offer as made.

The plaintiff next insists that the court below erred in failing to enforce its own pretrial rules when it did not require the defendant to file a narrative state-

---

2. Rule 43(a) in part is as follows: "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdic- tion of the state in which the United States court is held."

3. The term "parenchymal" means, in this connotation, an inflammation of the essential elements of the liver. See Dorland's Medical Dictionary, 21st edition.

ment, disclose names of witnesses, and furnish medical reports of examining doctors. Specifically she asserts that the fact that Penney did not file a Pretrial Narrative Statement as required by Rule 5(II), subd. C, par. 3 of the court below [4] was gravely prejudicial and that she was prejudiced further because her request, made almost at the close of her case, to require the defendant to produce a report or a copy of a report of an examination made by a Dr. Carpenter who had examined the plaintiff prior to trial at the request of Penney's insurance carrier, was not granted. A brief recital of the pertinent facts is necessary.

The record reveals that a pretrial conference had been scheduled in this case for Thursday, January 11, 1962 before Judge Rabe F. Marsh, Jr. In a letter dated December 29, 1961, plaintiff's counsel, Mr. McArdle, had requested Judge Marsh to postpone the pretrial conference and the filing of the required stipulation of facts until a few weeks after he returned to Pittsburgh, he being then about to leave the city. He stated that Penney's counsel, Mr. Martin, had agreed to the postponement and would so stipulate. Probably because of this letter, the apparent stipulation and Mr. McArdle's coming absence,[5] Judge Marsh entered an order on January 4, 1962, dispensing with the pretrial conference and directing that the case be listed for trial in the week of January 29, 1962. Judge Marsh's action of dispensing with the pretrial procedures referred to was authorized by Rule 5(II), subd. H of the Rules of Court of the United States District Court for the Western District of Pennsylvania.[6]

■ What the plaintiff's counsel did in effect was to dispense with pretrial and its aids, such as the narrative statement of his adversary as to the facts which would be offered by it, statements as to the oral or documentary evidence, and medical reports and the names of witnesses and classifications of witnesses to be called. He went ahead with the trial without this assistance and was content to do so. He made no complaint as to his failure to get a copy of Dr. Carpenter's report until the court had refused to exclude from evidence certain references in a damaging letter from Dr. Stuart N. Rowe, a neurosurgeon at the West Penn Hospital who had treated the plaintiff, a matter we shall deal with next in this opinion.

■ It is not clear upon what ground the plaintiff's counsel claims error, but in any event we cannot say that under the circumstances the trial court abused its discretion in refusing to compel Penney's counsel to produce the Carpenter report though many judges might well have reacted more responsively to Mr. McArdle's request. But, as we stated before, it was late in the plaintiff's case when the motion was made. Doubtless a way could have been found to get the report into the record if the plaintiff's counsel had wished to do so. He could

4. Rule 5(II), subd. C, par. 3 of the Rules of Court for the United States District Court for the Western District of Pennsylvania provides that a narrative written statement of the facts that will be offered by oral or documentary evidence for the defense at trial must be made, and
"There shall be attached to said written statement:
"(a) Medical reports of any doctor who treated, examined, or has been consulted in connection with the injuries complained of.
(b) Names and addresses of all witnesses the defendant expects to call. Said witnesses shall be classified as liability, medical or condition witnesses."

5. As we have stated the case at bar was an old one, the complaint being filed on January 3, 1957. We assume that Judge Marsh did not desire to delay the trial and felt that it could be disposed of adequately without the use of the usual pretrial techniques.

6. Rule 5(II) subd. H provides: "When a case is listed for pre-trial, it shall not be continued except for just cause. * * *" Rule 5(II), subd. A states: "There will be a pre-trial on every civil case, unless counsel for the parties stipulate in writing to the contrary an approval is given by the judge. * * *"

have made use of a subpoena duces tecum, but if he did so, he took the chance of bringing into evidence a document prepared by his adversary's insurance carrier which might have proved damaging to his case. Under the circumstances at bar we cannot hold that the trial judge's refusal to permit the plaintiff's counsel to inspect Dr. Carpenter's report constituted prejudicial error.

We come next to the plaintiff's assertion that it was prejudicial error to permit Dr. William C. Wycoff, one of the plaintiff's doctors, to read into the record the contents of a letter setting out a report received from Dr. Rowe by Dr. Wycoff and used by the latter as one of the bases for his medical opinion of the plaintiff's condition. After almost all of the contents of the letter had been read into evidence without valid objection, the defendant's counsel asked Dr. Wycoff: "Will you tell us what your interpretation of Dr. Rowe's report was in that report to Mr. McArdle [the plaintiff's counsel]?" The plaintiff's counsel objected on the ground that the answer to the question would not be the best evidence and seemingly also that it would be hearsay. The record is very far from clear on this point and the plaintiff's argument is equally cloudy but it seems that the question was not answered. The trial court so states in its opinion. The generalized objection or objections of the plaintiff's counsel on the grounds indicated came only at the time stated. Nothing of consequence occurred after the objection was made. If an objection made during the course of a trial is to be valid on appeal, the party offering the objection must make a clear record in respect to the issue in the trial court. An appellate tribunal cannot speculate as to what was or was not done or what was or was not said in the court below. The record here will not support the plaintiff's contention of error.

The plaintiff's next point is unusual. She claims she is entitled to a new trial because, to quote her brief: "The Court Erred in Excluding Plaintiff's Offer of Proof of the Cost of Food in Arizona, and by Limiting Plaintiff's Damages to the Increased Cost of Living." We think the plaintiff has overlooked what is in the record. This is as follows.

"MR. MCARDLE [the plaintiff's counsel]: Your Honor, not the cost of living, the cost of rental. *No charge for food*, no charge for gas and electricity. * * * If that is *food* there, that is our mistake."

"THE COURT:—Then on the front of this you are offering the airplane fare, the taxi, and you have *food* at $10.00 a day. What is that? $15.00 at 10 days—

"MR. MCARDLE:—That is an oversight, Your Honor. That should be deleted. We had intended to delete it. Actually, I think she is entitled to the food if it is on the trip, but we are not going to quibble over it." (Emphasis added throughout.)

The plaintiff has no appealable issue here.

The plaintiff also alleges that the trial court improperly restricted her cross-examination of Robert W. Walker, who at the time of the accident was employed by Penney as a department manager. Walker testified on direct examination as stated in substance at an earlier point in this opinion, that he was about eight feet from the plaintiff when she fell and that he had heard a "thud" as if the plaintiff had stumbled over the low-boy. Walker was walking from the front to the back of the store. The fact situation is not entirely clear but it would appear that when Walker turned he saw the plaintiff stumbling before her fall.

On cross-examination the plaintiff attempted to ascertain why Walker was where he said he was at the time of her fall. Walker had testified that he might have left his department in the back of the store to approve a check offered by a customer or to make an adjustment for a customer. The plaintiff then asked: "How would they tell you to come up to okay a check? Why wouldn't they seek you out since you were at the Shoe Department?" The court did not allow this question to be answered. The plain-

tiff contends that she was entitled to hear the details of why Walker was in the position he said he was in. Her brief states: "If his reason for being in that position was unsatisfactory or if his narrative was incoherent, the jury would have been entitled to disregard his testimony." The plaintiff's counsel made no formal objection to the court's refusal to permit the question. He asked: "Your Honor limits me on cross?" The court replied: "No, I am not limiting you, but I am keeping you on the subject of probative value. This is beyond cross-examination. I like to keep on the issues. I have always tried to do that."

The court was in error in restricting cross-examination at this point. But we cannot say that it was so gravely prejudicial as to warrant a new trial.

 Following a colloquy between the court and the plaintiff's attorney, Walker was then asked if he examined the floor after the plaintiff fell. He answered that he did not make an examination at that time. Later the witness testified that there was no string on the floor when he did examine it. The plaintiff then attempted to cross-examine Walker in regard to an answer to an interrogatory by Penney which had been read into the record earlier in that day's proceedings. The answer to the interrogatory was to the effect that string had been found on the floor near to where the plaintiff fell immediately after her fall. The plaintiff then asked if Walker was present in court when the answer had been read. The witness answered that he was not. At this point the court stopped this line of questioning. The plaintiff's counsel protested that the court was unduly limiting cross-examination and now contends that the action of the court deprived the plaintiff of her right to point up the contradiction between Walker's testimony and Penney's answer to the interrogatory. But the contradiction, if there was such, had already been demonstrated. The plaintiff was in a position to argue the inconsistency fully to the jury. But nonetheless the court ruled too restrictively here. It is true that the

bounds of proper cross-examination must necessarily lie within the sound discretion of the trial court, United States v. Stoehr, 196 F.2d 276, 280 (3 Cir. 1952), cert. denied, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952), but as was stated by Chief Judge Gourley in the court below in Cleland v. Peters, 73 F.Supp. 769, 773 (D.C.1947), citing Short v. Allegheny Trust Co., 330 Pa. 55, 198 A. 793 (1938): "[C]ross-examination of a witness may embrace any matter germane to the direct examination, qualifying or destroying it, or tending to develop facts which have been improperly suppressed or ignored by the party who was called as a witness." While we are of the opinion that the district court was too restrictive in curtailing cross-examination, we cannot perceive how the error was sufficiently prejudicial to warrant a reversal of the judgment on this ground alone. Cf. District of Columbia v. Clawans, 300 U.S. 617, 632, 57 S.Ct. 660, 81 L.Ed. 843 (1937).

 Later in the cross-examination Walker was asked about the plaintiff's granddaughter, Donna Jean Hughes, who had been injured slightly when her grandmother fell. Inquiry was made of Walker as to whether he knew that Penney had replaced Donna Jean's coat which had been torn in the accident. This question was objected to and the objection sustained. The plaintiff then asked: "Well, in connection with the little girl's injury, was anything done for her by you?" This line of questioning properly was stopped by the court. It was irrelevant and if permitted to continue might have been prejudicial to the defendant.

We must now deal with the most troublesome aspect of the plaintiff's appeal. She asserts categorically and expressly that she is entitled to a new trial because the court below conducted the trial in an atmosphere of hostility and prejudice not only to the plaintiff but also to the plaintiff's counsel. The plaintiff's brief contains the following statement which was reiterated in the oral argument before this court: "At the Pre-Trial stage of this case, the Court

entered a default order dismissing the action with prejudice for plaintiff's failure to timely file a Pre-Trial Statement. The decision of the Court was appealed to the Third Circuit, where, in a decision written by Judge Hastie, the case was reinstated and the dismissed order was reversed. Sleek v. J. C. Penney, 292 F.2d 256, 3rd Cir. This reversal has caused the trial judge to treat the instant case with hostility." The plaintiff's attorney had long been in default in filing the pretrial statement required by Rule 5 (II) of the rules of the court below, despite repeated warnings. An examination of the opinion of this court will demonstrate that we held that the trial judge was in error in concluding that he was without power to consider an application made by the plaintiff for relief under Rule 60(b), Fed.R.Civ.Proc., 28 U.S.C., from the order dismissing the action with prejudice because the trial court erroneously had reached the conclusion that the ten-day provision of Rule 59 limited the time for making a Rule 60(b) application. We reversed and remanded the case to the end that the court below could consider whether there was excusable neglect and reinstate the suit. The court below upon remand reinstated the action but ordered the plaintiff's counsel to pay into the registry of the court $1,000 as counsel fees to the defendant's counsel. The fee has been paid by the plaintiff's counsel.

So much for background. We shall now deal with the areas in which the plaintiff asserts hostility and prejudice were shown by the court.

The plaintiff insists that the court examined Dr. John W. Harmeir, one of her witnesses, in a hostile and prejudicial manner. Dr. Harmeir had testified in substance that the climate of Arizona was beneficial to the plaintiff's arthritis. The colloquy between the court and Dr. Harmeir is set out below.

"THE COURT: Just what are the changes in this area that have to do with this, doctor? How do they play a part in the possible disability of this plaintiff?

"THE WITNESS:—I think that most of us that have arthritic problems are worse in weather, whether it be ordinary arthritis or traumatic arthritis, we are worse in damp weather and cold weather than we are in the warm climate, warm, dry climate.

"THE COURT:—It helps the arthritis then; is that it?

"THE WITNESS:—Yes.

"THE COURT:—As distinct from any muscles or bones?

"THE WITNESS:—The muscles, too, absolutely. If you have any rheumatic condition, then that covers the whole field of muscles, bones and joints and so on. You are better in a warm, dry climate.

"THE COURT:—Where are those warm, dry climates in this country?

"THE WITNESS:—Well, I think that Arizona is one. I think Southern California, on the desert is one. Some people feel better in Florida. It all depends.

"THE COURT:—Most of us feel better in those climates anyway.

"THE WITNESS:—Even in the summer I think you might feel all right there too.

"THE COURT:—In the winter, certainly.

"THE WITNESS:—Certainly in the winter.

"THE COURT:—Regardless.

"THE WITNESS:—Yes, that is true.

"THE COURT:—Arthritis or not you still would feel better in Arizona if you were there today, arthritis or not.

"THE WITNESS:—That is probably true.

"THE COURT:—In other words, we hear people say various things, say them today, one day or two days, that today is a dry day and praise it, it doesn't bother a person as much as it did the other day when it was raining. You feel aches in your bones those days this time of year, chiefly in weather like here, the weather here locally."

Were these inquiries by the trial judge prejudicial to the plaintiff's case? We think the answer must be that they were not. It can be argued that the

judge's interrogation did not go far toward clarifying any issue or correcting any misunderstanding of the testimony. But we are far from certain that such a position would be a correct one. The trial judge was in effect exploring the views of the witness as to the effect of Arizona's dry climate on the plaintiff's health generally. It will be borne in mind that the plaintiff was contending that it was necessary for her to go to Arizona to improve her arthritic condition and that she was suing to recover some of the expenses incurred by her in traveling.

The plaintiff next complains of an interrogation of Dr. Tuchler by the court. Dr. Tuchler had testified as a psychiatrist that the depression from which the plaintiff suffered was a by-product of her accident. The interrogation during cross-examination in pertinent part was as follows:

"THE COURT:—How does the patient himself determine whether he needs psychiatric treatment? How does he determine it?

"THE WITNESS:—Most people don't make that determination, Your Honor.

"THE COURT:—Some other doctor sends him to you?

"THE WITNESS:—There are many people desperately sick that would be the last person to see a psychiatrist. These are the paranoid, suspicious people.

"THE COURT:—People like most of us walking around, how can we tell if ought if we ought to see a psychiatrist?

"THE WITNESS:—If your agony gets sufficient and you want a little relief, and you hope the doctor can help you. The doctor helps you to help yourself. He cannot do a great deal, perhaps from a point of view of something he can give you or help you with a philosophy of life.

"THE COURT:—Do you have people walk in? I mean, this is while—

"THE WITNESS:—No I do not.

"THE COURT:—Do you have people walk in off the street and state that they think they ought to see a psychiatrist?

"THE WITNESS:—Not often. I only see a referable practice. However, when you do have people walking in, you frequently have people with minor disturbances. They should be with a medical man rather than with a psychiatrist.

"THE COURT:—Isn't it true, though, that a person with a long history of illness of various kinds, maybe some of them with falls or some brought on by various things, aren't they apt to be depressed just because of a whole series of incidents that happened to them?

"THE WITNESS:—Yes, that is where the 50 per cent of a practice of general medicine done by an average general practitioner is * * * practicing psychiatry. The average general practitioner does not see medical cases. Over the majority of his cases are functional, have to do with emotions.

"THE COURT:—How in this case can you separate, we will say, and attribute her depression to a fall here when she has this record? I assume you know it, you have the history, she has had so many things, illnesses, various things, gall bladder operation, a toe removed, headaches, a little heart trouble, and all that sort of thing, how do you tie it down to one thing now?

"THE WITNESS:—It can be done.

"THE COURT:—Do you think you can do it?

"THE WITNESS:—Yes."

■ The trial judge in our opinion was examining the doctor, an expert in psychiatry, as to whether or not he could pinpoint the plaintiff's fall in Penney's store as the cause of her depressive reaction, in the light of the several other physical ills from which she had suffered. The substance of Dr. Tuchler's answer was that he could pinpoint the fall as the cause of the plaintiff's depression. We can perceive no basis for sound criticism of the judge's conduct here. The judge clearly had a right to ask the questions that he did. As we said, albeit in another connection in American Cyanamid Company v. Sharff, 309 F.2d 790, 798 (3 Cir., 1962): "The trial court should not deem itself to be 'a mere keeper of

the ring' in the tradition of the English civil law."

The plaintiff's next contention is that the court's interrogation of her was unfair and prejudicial. We have examined this interrogation several times— as we have all the others—and we conclude that the charge is unfounded. The trial judge, in our opinion, was merely trying to straighten out the confusion in the plaintiff's own testimony.

The plaintiff also asserts that the trial court disparaged her counsel before the jury. Again it is necessary to set out the testimony and some background. Dr. Tuchler was testifying on cross-examination and he was asked to find and to examine a report made by one of the plaintiff's doctors. The precise nature of the report is not pertinent here. Mr. Martin, the defendant's counsel asked: "[I]t refers, does it not, to an examination which had been done earlier by Dr. Stuart N. Rowe?

"A. Yes.

"Q. Does * * * [it] give the date of the examination by Dr. Stuart N. Rowe?

"A. It does not sir.

"Q. But it does refer to the patient as—if you turn to the first page of the letter and first sentence of the last paragraph, beginning on the first page, it refers to her as an enigma; is that right?

"MR. MCARDLE:—If the Court please. We have the report of Dr. Rowe to Dr. Wycoff. We have that rather than Dr. Wycoff's reference to it which we will offer to counsel.

"MR. MARTIN:—I have a copy of the report.

"THE COURT:—He has a copy.

"MR. MCARDLE:—Of the original report?

"MR. MARTIN:—I have a copy of the report.

"THE COURT:—There is no question about [what] it says, about what the report is. I think he is entitled to it, it is part of the file that the witness handed over to Mr. Martin, as I understand.

"MR. MARTIN:—This is right.

"THE COURT:—Yes, go ahead. In other words, don't be quite so helpful, Mr. McArdle. He seems to be getting along all right.

"MR. MCARDLE:—Well, I was trying, if the Court please—

"THE COURT:—He is getting along all right. In other words, it is a great point to interfere in the cross-examination and break the train of thought. I do not think that is a proper thing to do. I don't think it is fair.

"MR. MCARDLE:—I don't think it is fair of Your Honor to accuse me of this.

"THE COURT:—You will notice this, that counsel will very often do that when defense counsel is trying to make a point. I call your attention to the fact they are getting along all right. Do not interrupt. When one counsel examines, I would like to have the other fellow sit down so the fellow who is doing the interrogating has the full attention of the jury. This is the practice I would like to have followed."

We entertain no doubt that the statements of the court did reflect unfavorably on the plaintiff's counsel's conduct to some degree. But we cannot say that the reflection was of such a serious nature as to constitute reversible error, particularly in view of the court's statement in its charge that, "We have had the benefit in this case, members of the jury, of having two of the most competent, experienced and able counsel of the Allegheny Bar of the Western District of Pennsylvania. We see lawyers in the Federal Court come in from all over the country and these two gentlemen are just as good as anyone. * * *" We point out, however, that if plaintiff's counsel had been guilty of frivolously or unnecessarily interrupting the proceedings— though we do not say that had occurred here—the better course for the court to have pursued would have been to call counsel to side bar and there administer such a rebuke as it deemed necessary.

The plaintiff next asserts that the court disparaged her case by suggesting the possibility that she was malingering. The issue arises because of a question asked Dr. Wycoff on cross-examination. Dr. Rowe's letter, most of the contents of which had been read into the record without valid objection, had stated that in examining the plaintiff he "could find no atrophy of the shoulders or arms. On this occasion during the examination all movements of the neck were extremely limited to about three to five degrees. However, previously during the taking of the history the patient had shown no evidence of limitation of neck movements, no loss of motor power or any change in tendon reflexes could be found." This constituted a suggestion that the plaintiff's difficulties in moving her neck might be fictitious.

The defendants' counsel asked Dr. Wycoff: "And is there anything that is known to medical science which would explain an ability to move the neck freely a moment before the physical examination, and then an inability to move more than three or five degrees at the time of the physical examination?"

Mr. McArdle, the plaintiff's attorney, then said, "That is objected to. That was not in the report." The court then said: "Well, of course, that would assume at some time that she was malingering, as I understand it."

■■ The plaintiff insists that the use of the term "malingering" by the court was gravely prejudicial to her case. To malinger is defined as "acting the part of a malingerer; to feign illness, or inability."[7] The trial judge perhaps equated neurosis with malingering. A careful reading of the transcript indicates that he did not imply that the plaintiff actually was malingering but there was a suggestion of such a possibility. A federal trial judge may express his views respecting the probative value of the evidence but if he does so he must make it clear to the jury that it is its sole right to determine the weight and credibility of the evidence. In his charge the trial judge made several statements of a general nature to this effect, but the word "malingering" is a strong and ugly term. If it is to be employed by a trial judge, under the circumstances at bar, he should make sure that the members of the jury clearly understand their function as triers of the fact and that they are the sole judges of the credence to be given to the evidence. We are of the opinion that the trial judge should have pointed this out to the jury in respect to his use of the term "malingering" and it would have been appropriate for him to have done so at the time the statement was made by him. It should be noted, however, that the plaintiff's counsel apparently did not think the incident of sufficient importance at the time of its occurrence or thereafter to request the court to give any special instruction to the jury or to ask for the withdrawal of a juror when the court used the word "malingering." In fact, the plaintiff's counsel made no objection to the use of the word. His objection was to Dr. Rowe's statement respecting the inability of the plaintiff to move her neck freely, coming into the record "from the mouth of Dr. Wycoff."[8] We are of the view that the malingering incident cannot be deemed to be of sufficient consequence to justify a new trial. In so saying we are aware that Dr. Wycoff was an important witness for the plaintiff and we are not unmindful of what we said in Groce v. Seder, 267 F.2d 352 (1959).

■ In general on the subject of the proper conduct of the trial judge we lay emphasis on Myers v. George, 271 F.2d 168, 174 (8 Cir. 1959), in which the court correctly stated: "In jury trials the trial judge should be cautious and circumspect in his language and conduct before the jury. He must be fair to both sides, and the extent to which he may go in

---

7. Webster's New International Dictionary, 2 edition.

8. It will be remembered that we discussed the status of this matter on the issue of admissibility at an earlier point in this opinion.

comments and remarks during the trial is governed by the fundamental principle that nothing should be said or done by him which will prejudice the rights of the parties litigant. * * * This includes remarks to counsel touching the management of the case and reflecting on their conduct, as well as those touching the character of the witnesses and the value of their testimony." Cf. Lindeman v. Textron, Inc., 229 F.2d 273, 276 (2 Cir. 1956).

We have examined all of the incidents to which the plaintiff has referred. Perhaps more might be said about some of them but we think that what we have already written is sufficient to show that the plaintiff has failed to sustain her charges of bias on the part of the trial judge. We think that the sum total of what has been stated respecting his interrogations, comments and rulings do not demonstrate that the plaintiff suffered substantial prejudice during the course of the proceedings and that a new trial should be ordered. In this connection this opinion should be read with Cromling v. Pittsburgh and Lake Erie R. R. Co., 3 Cir., —— F.2d ——, filed concurrently with this opinion.

On its appeal, Penney contends that the jury's finding of liability was not supported by sufficient evidence. Penney points out that its liability depended on the jury finding that the plaintiff's accident was caused by her tripping over a piece of string lying on the floor. Penney contends that the evidence does not support such a finding.

Reviewing the record in light of this contention it is clear that neither the plaintiff nor any witness gave direct testimony as to the cause of the fall. There is testimony that a piece of wrapping cord was found at or near the spot in the aisle where the plaintiff fell. She testified that as she walked toward her daughter-in-law her right foot was caught by something and that after her fall she discovered wrapping cord on her shoe that was the same as the cord in the aisle and the cord which was traced back to the defendant's spindle.

In determining whether sufficient evidence was presented to support the jury's finding since this is a diversity case, we must look to the law of Pennsylvania. There is enough evidence to support the inference obviously drawn by the jury, that the plaintiff became entangled with or tripped over wrapping cord or string negligently left in the aisle of the Penney store by Penney employees. See Smith v. Bell Telephone Company of Pennsylvania, supra, 397 Pa. at 138, 153 A.2d at 479. Compare Dorofey v. Bethlehem Steel Company, 407 Pa. 288, 180 A.2d 562 (1962), in which the facts are clearly distinguishable from those of the case at bar.

All the issues raised by either party have been duly considered. We have expressed our views concerning those which we think merit consideration.

The judgment will be affirmed.