Clayton Ralph **UITTS** and Elva E. Uitts

v.

**GENERAL MOTORS CORPORATION.**

Elva E. **UITTS,** Co-Administratrix of the Estate of Mary Alice Hollingsworth, Deceased

v.

**GENERAL MOTORS CORPORATION.**

Civ. A. Nos. 72–150, 72–1485.

United States District Court, E. D. Pennsylvania.

Aug. 19, 1974.

Theodore R. Mann, Barry E. Ungar, Philadelphia, Pa., for plaintiffs.

George J. Lavin, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM

HUYETT, District Judge.

Plaintiffs in this products liability action arising out of an automobile accident seek a new trial. The matter was tried before a jury which returned a verdict for the defendant. For the reasons which follow plaintiffs' motion for a new trial is DENIED.

At the trial plaintiffs contended that defendant was liable under the Restatement of Torts (Second) § 402A for defective design, manufacturing, testing, inspection or assembly of the vehicle, a Chevrolet K–10 Carry-all Blazer. Plaintiffs did not allege a specific defect but rather relied upon the theory enunciated in *MacDougall v. Ford Motor Co.,* 214 Pa.Super. 384, 257 A.2d 676 (1969), which held that "the occurrence of a malfunction of machinery, in the absence of abnormal use and reasonable secondary causes is evidence of a defective condition within the meaning of § 402A." Plaintiff Elva Uitts testified that in August, 1970 she was operating her son's vehicle which she alleges went out of control without any warning, swerving sharply to the left across the highway, crashing into an embankment.

Plaintiffs allege several grounds for a new trial.

Plaintiffs first contend that we erred in excluding from evidence certain reports of defendant, General Motors Corporation. At trial plaintiffs sought to enter into evidence certain reports (known as "1241 Reports") produced by defendant in response to a court order requiring production. These reports concerned incidents which involved identical or substantially similar vehicles which allegedly veered to the left or to the right. While admittedly these reports contain hearsay, plaintiffs seek to admit them under the business records exception to the hearsay rule. Plaintiffs claim these

reports are relevant as evidence of substantially similar accidents of similar products which corroborate plaintiffs' claim that the accident resulted from a malfunction of the vehicle. Briefs were submitted by the parties at trial and the issue was argued extensively at that time. After careful consideration we ruled that the reports were not admissible.

■ Plaintiffs contend that these reports are admissible under the federal[1] or state[2] business records act and under the authority of *Pekelis v. Transcontinental and Western Air, Inc.,* 187 F.2d 122 (2d Cir. 1951). In *Pekelis* the court held that an accident report compiled by defendant comprised a business record and could be used at trial by plaintiff. The accident report however, concerned the accident which was the subject of the litigation and involved an airplane crash, not an auto crash. The report in *Pekelis* was the result of a long and detailed process undertaken by defendant expressly for the purpose of determining the cause of the airplane crash. The procedure for the investigation was established by the defendant and involved various steps of investigation culminating in a *final* report as to the cause of the accident. The list of persons involved in the investigation clearly demonstrates the significance attached by the corporation to the process. Considering these factors it is apparent that the inherent reliability, which is the basis for the business records exception, is present in the *Pekelis* accident report.

■ The reports offered in the present case do not have this indicia of reliability. They include statements by owners concerning the occurrence of an accident and reports by General Motors personnel concerning inspection of the involved vehicle, when possible. In addition, some of the reports contain letters of owners and police reports. The 1241 reports offered by plaintiffs were not the result of a continued and detailed investigation, but rather served merely as a preliminary investigation involving only the taking of a statement from the driver and if possible an inspection of the vehicle in question. The persons compiling these reports were not required to assemble all the factual data, or determine the cause or extent of the damage. They were charged with merely reporting the statements of the owners without any duty to cross examine or investigate further. The purpose of these reports was to alert defendant to possible difficulties with its product. They were not intended to commit the defendant in any way and as such were not intended to be final or amount to a complete analysis of a particular accident or its cause, as was the report in *Pekelis.*

Even if we were to decide that the reports did contain sufficient reliability for admission into evidence, we would also have to find that the reports are relevant and probative of the issue of causation. In *Pekelis* the report which was ruled admissible concerned the accident which was the subject of the litigation. The 1241 reports offered in the present case concerned accidents other than the one which is being adjudicated. Clearly, an investigation into the cause of the very accident being litigated, as in *Pekelis,* would be relevant. The same result, however, does not obtain when the reports sought to be introduced relate to other accidents the cause of which may or may not have already been litigated. A review of these reports shows that various malfunctions were alleged to have caused the accident.[3] Because of the nature of the reports we do not believe them to be admissions by the defendant, and therefore to permit them to be considered by the jury would be tantamount to allowing the persons mak-

1. 28 U.S.C. § 1732.
2. 28 P.S. § 91b.
3. In fact, one report contained an allegation that the sudden veering was caused by a broken left front main spring. Plaintiffs in the instant case have admitted that prior to impact the left front main spring of the Uitts' vehicle was not broken. Accordingly, this report could in no way be probative of the cause of the alleged malfunction in the Uitts' vehicle.

ing the statements to testify against defendant without being subject to cross examination or required to take an oath. Therefore, any probative value these reports might have is outweighed by their prejudicial nature.

■ Proof of prior accidents or occurrences are not easily admitted into evidence, since they can often result in unfair prejudice, consumption of time and distraction of the jury to collateral matters. *See* McCormick on Evidence, § 200 (2d ed. 1972); *United States v. Kearney*, 136 U.S.App.D.C. 328, 402 F.2d 170 (1969). The introduction of these reports into evidence in this case would have had this very result. Plaintiffs sought to enter thirty-five of these reports into the record. In an earlier Memorandum and Order in this case, *Uitts v. General Motors Corp.*, 58 F.R.D. 450, 452 (E.D.Pa. 1972), we held that for purposes of discovery, "similar accidents with identical equipment are relevant to the determination of causation." With respect to these reports plaintiff is attempting to introduce proof of accidents involving similar, not necessarily identical, vehicles. An examination of these reports reveals that some of them contain either highly inflammatory letters of owners or police reports relating to details of the accidents, which would clearly be inadmissible. Plaintiffs made no attempt to limit or delete the hearsay portions of these reports.[4] Rather, plaintiffs insisted that each of the reports without exception be admitted into evidence. Defendant, in order to minimize the prejudicial effect of these reports, would have had to go through each one individually with the jury. The result would have been a mini-trial on each of the thirty-five reports offered by plaintiffs. This would lengthen the trial considerably and the minds of the jurors would be diverted from the claim of the plaintiffs to the claims contained in these reports. Plaintiffs chose not to attempt to prove a specific malfunction or defect of the ve-

hicle, but rather, to rely upon the *MacDougall* theory to establish liability. The effect of *MacDougall* is to lessen plaintiffs' burden of proof by allowing plaintiffs to establish a prima facie case merely by showing the occurrence of a malfunction in the absence of abnormal use and reasonable secondary causes. This lower burden of proof, however, does not result in a lower standard of admissibility under the rules of evidence. If plaintiffs were attempting to prove the existence of a specific defect or malfunction it is clear that the admission into evidence of the occurrence of similar accidents would require a showing that those accidents were caused by the same malfunction or defect. Simply because plaintiffs are proceeding under the *MacDougall* theory we do not believe they can introduce evidence of accidents which may involve a variety of causes, and then let the jury guess which of those causes was responsible for the accident in the present case. Since these reports are being introduced by plaintiffs merely to corroborate the testimony of Elva Uitts we believe the prejudicial nature of them far outweighs any probative value they might have, and accordingly we do not think it was error to exclude them from the record.

■ Plaintiffs next contend that we erred in unduly limiting the cross examination of the defendant's witness, Dr. Helmuth Engelman. Dr. Engelman was head of the Highway Accident Research Team of Ohio State University which was under contract with the United States Department of Transportation to perform independent multidisciplinary accident investigations. Such an investigation was performed in this case. On direct examination Dr. Engelman concluded, based on his study and report, that there was no defect in the Uitts' vehicle which was the cause of the accident. On cross examination plaintiffs' counsel questioned Dr. Engelman as to a portion of his report which concluded

---

4. Plaintiffs did offer to delete from the reports the transmittal pages to Royal Indemnity In-

surance Company and that portion concerning bodily injury.

that the Uitts' vehicle was defective. It was Dr. Engelman's conclusion that the Uitts' vehicle should have had a partition between the seats and the loading area to prevent a load in the back of the vehicle from shifting forward and interfering with or injuring either the driver or passenger. In addition, Dr. Engelman concluded that the vehicle lacked a locking device on the seats to prevent them from being forced forward and that the vehicle did not have a collapsible steering column.[5] Defendant objected to the question on the basis that plaintiffs were attempting to transform their theory of recovery from a mechanical malfunction under *MacDougall* to a theory based on the crashworthiness of the vehicle. After extended argument outside the hearing of the jury we sustained the defendant's objection but allowed counsel to rephrase the question.[6] Admittedly, lack of a partition, absence of seat locks and a non-collapsible steering column would be relevant evidence if plaintiffs' theory of liability rested on the crashworthiness of the vehicle. Plaintiffs, however, chose to proceed under the theory that a mechanical malfunction caused the vehicle to suddenly veer off the road. To allow plaintiffs to proceed in this manner would be permitting them to change their legal theory in the middle of the trial. The purpose of discovery under the federal rules is to prevent this kind of surprise to either party. Plaintiffs had Dr. Engelman's report far in advance of trial and could have proceeded on a crashworthiness theory as an alter-

native to their *MacDougall* theory. Obviously it would be improper to permit plaintiffs to inject a new theory of recovery into the case at this time.

■ Plaintiffs next argue that the lack of a partition may have been a cause of the accident. They hypothecate that a shifting of the load interfered with Elva Uitts' operation of the vehicle thereby causing the accident. In this way plaintiffs sought to introduce evidence on a lack of a partition under their *MacDougall* theory. Plaintiffs asked Dr. Engelman two hypothetical questions relating to the partition.[7] Defendant objected to both questions on the ground that they created a hypothetical situation which lacked any factual or testimonial basis in the record. The testimony of Elva Uitts denied that the load had shifted into the driver's compartment. She testified that she was driving along the highway when suddenly the vehicle, without warning, went out of control. Allowing plaintiffs to introduce this hypothesis as a possible cause of the accident would require the jury to consider the direct testimony of Elva Uitts as being untrue and totally ignore the fact that there was no evidence that the shifting of the load caused the accident. In *Sleek v. J. C. Penny Co.*, 324 F.2d 467 (2d Cir. 1963) the Court of Appeals stated that "under Pennsylvania law the 'jury may not be permitted to reach its verdict on the basis of speculation or conjecture'." The only areas of questioning from which we

---

5. Plaintiff asked:

"Q. And you later in your report conclude, do you not that the failure of General Motors to put a compartment between the seat and the loading area . . . was a defect in the vehicle?" (N.T. 284–85).

6. Plaintiffs did rephrase the question as follows:

"Q. How do you explain that testimony in light of the information on page 10 of your report which indicates that you concluded, one, that a partition should be installed between the passenger compartment and secondly, that a locking device should be incorporated on the seats to prevent the seats from being

forced forward, and thirdly, that there should be a collapsible steering column?" (N.T. 326.)

Dr. Engelman answered this question at length.

7. Plaintiffs asked the following questions:

"Q. Now, I take it that if there had been nothing wrong with the vehicle, that Mrs. Uitts, when she arrived at the western lane, all she would have had to have done was turn the wheel to the right, is that not so?" (N.T. 342.) and

"Q. To what extent if at all do you think that load penetration into the driver's compartment would affect a driver's ability to turn a steering wheel to the right?"

precluded plaintiffs were those without any factual basis in the record.[8]

■ Plaintiffs next contend that we erred in excluding the deposition of Grant Jackson, which plaintiffs sought to introduce as rebuttal testimony, in order to impeach and cast doubt upon the thoroughness of Dr. Engelman's investigation. Plaintiffs were attempting to show that when the left front center bolt of a K–10 vehicle is sheared the left front axle will move rearward and the vehicle will veer to the left. Plaintiffs then offered evidence that such center bolts have sheared in at least five instances. Initially we note that neither Dr. Engelman nor Gerald Confer, defendant's expert, testified that this would not happen when a left front center bolt is sheared. Thus, this would not seem to be proper rebuttal testimony. Plaintiffs then argue that such evidence is admissible to cast doubt upon the thoroughness of Dr. Engelman's report. Evidence of a defect in other vehicles cannot be taken to prove the existence of a defect in the Uitts' vehicle, and consequently, could not impune the integrity of Dr. Engelman's investigation. Dr. Engelman testified that in checking the attachment of the axle housing to the front spring, "we looked for evidence of any shifting whatsoever and could see no evidence of any shifting at all  .  . ." (N.T. 358). He testified that the U–bolts hold the spring to the axle and if the U–bolts are loose there will be shifting. (N.T. 358). Since there was no shifting he concluded that the U–bolts were not loose. To introduce evidence that shifting had occurred in five other vehicles does not necessarily rebut or attack the thoroughness of the investigation of the present vehicle.

■ Finally, plaintiffs contend we erred in not charging the jury on the issue of contributory negligence. Defendant in his closing speech did not argue contributory negligence as a defense. Although we did indicate to counsel that we would include it in our charge, after listening to the closing speeches we did not give the instruction to the jury, because we thought it would be more confusing than instructive. Plaintiffs' counsel was free to argue the point to the jury. Plaintiffs' counsel, in closing, argued that if the negligence of plaintiff and the malfunction of the vehicle were each a substantial factor in causing the accident, then in this kind of case, where contributory negligence is no defense, General Motors has to stand by its product which malfunctioned. We charged the jury as follows:

"It is also the position of plaintiffs that if you conclude that the vehicle veered out of control through driver error, you may still find in favor of the plaintiffs, if you find a malfunction in the vehicle in that when Elva Uitts tried to turn right the vehicle did not respond. In order for you to find defendant liable under this last theory of plaintiffs, you must find as facts based upon the credible testimony in the record that Elva Uitts attempted to turn the vehicle to the right, but because of a malfunction, the vehicle failed to respond to her attempted turn." (N.T. 557).

This instruction allowed the jury to find for plaintiffs even if the initial veering of the vehicle was caused by driver error, that is, contributory negligence. We do not believe that plaintiffs were harmed because of our failure to include a specific instruction on contributory negligence.[9] For all of the above reasons, we shall deny plaintiffs' motion for a new trial.

---

8. We note that the cross examination of Dr. Engelman consisted of more than fifty pages of the record.

9. We have also given careful consideration to the other contentions of the plaintiffs in support of their motion for a new trial and find them to be without merit.