Carol S. **GUILD** and John **Guild, Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

No. 95–CV–6582.

United States District Court, W.D. New York.

June 1, 1999.

Norman A. Palmiere, Palmiere Law Firm, P.C., Rochester, NY, for Carol S. Guild and John Guild, plaintiffs.

Paul D. Jureller, Thorn & Gershon, Albany, NY, for General Motors Corporation, defendant.

## DECISION AND ORDER

FELDMAN, United States Magistrate Judge.

### Factual Background

In this products liability action, plaintiff Carol Guild (hereinafter Guild) claims that her 1987 Cutlass, manufactured by defendant General Motors, (hereinafter GM) was "uncrashworthy" in that it was equipped with a defective and unsafe seat belt system. Specifically, Guild alleges that the seat belt system utilized in her automobile was defective, dangerous and unsafe because in certain crash settings inertial forces generated during a collision will cause the seat belt buckle to release and unlatch. Guild claims that on May 26, 1993, while properly restrained in her seat belt, the Cutlass she was driving collided with another automobile. According to Guild, during the collision her seat belt unlatched causing her to sustain serious injuries which were enhanced by the failure of the seat belt system to properly operate. GM denies the existence of any defect in the seat belt. GM also contends that Guild was not wearing her seatbelt at the time of the accident.

### Decision

Presently before the Court are various pretrial motions in limine filed by the parties in anticipation of trial. A lengthy hearing was held by this Court on May 28, 1999. Based on the arguments and detailed submissions made by the parties, the Court makes the following pretrial rulings.

*1. Admissibility of the National Highway Transportation Safety Administration (NHTSA) Investigation:* In 1992, in response to a petition submitted by the Institute for Injury Reduction (IIR), NHTSA conducted an extensive investigation into the phenomena of inertial release of "side release" seat belt buckles. As part of their investigation, NHTSA reviewed crash test data, analyzed real world accident data, performed full scale crash and other testing of buckles, requested information from motor vehicle and safety belt manufacturers, and evaluated consumer complaints alleging spontaneous buckle release. The NHTSA report concluded that their "comprehensive review of all available information" failed to "provide any evidence that there is a safety problem associated with inertial unlatching of safety belts." GM seeks to introduce a certified copy of the NHTSA as evidence of non-defect.

The issue of inertial release of seat belts is obviously a critical issue in this litigation. The NHTSA report is

clearly relevant to this issue. *See* Fed. R.Evid. 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Although hearsay, the NHTSA Report is admissible as a public record pursuant to Fed.R.Evid. 803(8). It is well settled that administrative reports and investigations are admissible pursuant to Rule 803(8). The reliability of the public agencies conducting the investigations and their lack of motive to conduct biased inquiries support their admission into evidence. *See Livingston v. Isuzu Motors, Ltd.,* 910 F.Supp. 1473, 1497 (D.Mont.1995) (NHTSA investigation into vehicle roll-overs admissible under Rule 803(8) in product liability action). The fact that the NHTSA report contains conclusions in addition to factual findings does not preclude admission so long as the report's conclusions are factually based and thus reliable. *Beech Aircraft v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). *See generally* Grossman and Shapiro, *The Admission of Government Fact Findings Under Federal Rule of Evidence 803(8)(C): Limiting the Dangers of Unreliable Hearsay,* 38 U.Kan.L.Rev. 767 (1990); Musselman–Brown, *Admitting Opinions and Conclusions in Evaluative Reports: The Trustworthiness Inquiry– Beech AirCraft Corp. v. Rainey,* 64 Wash. L.Rev. 975 (1989).

Citing *Bright v. Firestone Tire and Rubber,* 756 F.2d 19, 22 (6th Cir.1984) and *Fowler v. Firestone Tire and Rubber Company,* 92 F.R.D. 1 (N.D.Miss.1980), plaintiff worries that admission of the NHTSA report will cause her unfair prejudice, "because the jury may be unduly influenced by the official character of the report and afford it greater weight than it deserves." *See* April 28, 1999 Affirmation of Norman Andrew Palmiere, at page 38. However, both *Bright* and *Fowler* predate the Supreme Court's analysis of Rule 803(8) in *Beech Aircraft v. Rainey.* Moreover, as the Supreme Court stated in *Rainey:*

"[O]f course it goes without saying that the admission of a report containing 'conclusions' is subject to the ultimate safeguard—the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions." *Beech Aircraft v. Rainey,* 488 U.S. at 168, 109 S.Ct. 439, 102 L.Ed.2d 445. Finally, this Court will consider, if requested, giving an instruction to the jury similar to the instruction given in *Cohen v. General Motors Corp.,* 534 F.Supp. 509, 512 n. 3 (W.D.Mo. 1982), cautioning the jury that this lawsuit is an "independent inquiry" and that "the result of the NHTSA investigation is not binding" on them.

*2. Admissibility of GM Crash and Sled Test Videos:* During discovery, plaintiff obtained from GM videotaped crash and sled tests which, according to Guild, show inertial unlatchings. Guild claims the sled test results are relevant because they show "a center release push-button buckle unlatching upon the application of accident forces and accelerations without any component breakage or foreign object striking the buckle release mechanisms." Palmiere Affirmation at page 13. Guild also seeks admission of the crash tests. One set of crash tests (the "N" car tests) was conducted by GM prior to plaintiff's accident and involved the same type of belt buckle which was installed on her car. The other tests (the "H" car tests) were conducted after plaintiff's accident and utilized a similar, but not identical, seat belt buckle.

■ The admissibility of the "crash test" evidence at issue here depends upon a foundational showing of a substantial similarity between the test results being offered into evidence and the circumstances of the accident at issue in the litigation. *Ramseyer v. General Motors Corp.,* 417 F.2d 859, 864 (8th Cir.1969). However, perfect identity between experimental and actual conditions is neither attainable nor required. *Lobel v. American Airlines,* 205 F.2d 927, 931 (2d Cir.1953).

"Substantial similarity depends upon the underlying theory of the case," *Four Corners Helicopters, Inc. v. Turbomeca S.A.*, 979 F.2d 1434 (10th Cir. 1992), and is defined by the particular defect at issue, *Jackson v. Firestone Tire & Rubber*, 788 F.2d 1070, 1083 (5th Cir. 1986). The alleged defect at issue here is the inertial unlatching of a side release seat belt buckle following a collision. The "N" car crash tests that plaintiff seeks to admit involve precisely the same seat belt buckle as that allegedly worn by plaintiff. The "H" car test utilizes a Type I buckle which has been described by GM's expert as operating under the same principles and requiring the same release pressure as the buckle worn by plaintiff. *See* Palmiere Affirmation at page 20. In addition, the collision speed (approximately 30 mph) and the change in velocity (delta v) factors used in the "N" and "H" car tests are consistent with the plaintiff's theory of the speed and forces involved in her accident. Plaintiff's experts have relied in part upon the crash tests to support their opinion of defect and causation. The relevancy of the "N" and "H" car tests to the plaintiff's theory of causation is apparent to this Court.

To be sure, there are differences between the crash tests and the actual collision at issue here. But GM's argument that these differences are so substantial as to make the test results irrelevant strike this Court as precarious, if not factually incongruous. For it must be remembered that the NHTSA report which GM so strenuously seeks to admit at trial is based in part on the government's analysis of *2,067 different crash and sled tests involving the performance of both side release and end release seat belts.* Obviously, none of these tests attempted to duplicate the collision dynamics present in plaintiff's accident. Indeed, one can assume that most of the 2,067 crash and sled tests noted in the NHTSA report are far more dissimilar to the facts of plaintiff's accident than the few crash and sled tests plaintiff seeks to introduce at her trial. Yet, GM contends the results of the thousands of crash and sled tests relied on in the NHTSA report are similar enough to be properly relied upon by NHTSA in support of the agency's finding that there exists no reliable evidence of inertial release defects in safety belts. Suffice it to say that if the crash tests are similar enough to be evidence of non-defect, they are similar enough to be evidence of defect as well.

GM will be given ample opportunity to cross-examine plaintiff's witnesses with regard to the crash tests and to point out the differences between the actual collision and the videotaped recording of the tests. However, I find these differences go to the weight to be accorded the test results and do not bar their admissibility. *See Szeliga v. General Motors Corp.*, 728 F.2d 566, 567 (1st Cir.1984) ("Dissimilarities between experimental and actual conditions affect the weight of the evidence, not its admissibility"). *See also Shipp v. General Motors Corp.*, 750 F.2d 418, 427 (5th Cir.1985) (GM's relevancy objections to test film go to the weight to be given the evidence and there was no abuse of discretion in admitting test results); *Livingston v. Isuzu Motors, Ltd.*, 910 F.Supp. 1473, 1493 (D.Mont. 1995) (demonstrative tests admissible where defendant free to put before jury differences between tests and actual accident); *Dorsett v. American Isuzu Motors, Inc.*, 805 F.Supp. 1212, 1229 (E.D.Pa.1992) (even though crash tests "were not identical to the accident, they were similar enough to aid the jury in determining what happened" to plaintiff).[1] Accordingly,

---

1. Upon an appropriate request by GM, this Court will consider giving a cautionary limiting instruction reminding the jury that the tests are not re-enactments of the plaintiff's accident. *See Veliz v. Crown Lift Trucks*, 714 F.Supp. 49, 51 (E.D.N.Y.1989) ("Courts have recognized, however, that when accompanied by limiting instructions or testimony detailing the dissimilarities between the demonstration and actual conditions, it is not error to admit demonstrations that are substantially similar

GM's motion to preclude admission of the "N" and "H" car crash tests is denied.[2]

■ *3. Admissibility of the "1241 Reports":* 1241 Reports are complaints received by GM from consumers concerning the failure of one of its products. They include statements by owners/drivers of its vehicles regarding the occurrence of the product failure and reports by GM personnel concerning inspection of the vehicle involved. The purpose of the reports is to alert GM to possible difficulties with its product. 1241 Reports are "not the result of a continued and detailed investigation, but rather served merely as preliminary investigation." *Uitts v. General Motors,* 411 F.Supp. 1380, 1382 (E.D.Pa.1974) 1241 reports are "not intended to commit the defendant in any way and as such were not intended to be final or amount to a complete analysis of a particular accident or its cause." *Id.*

Plaintiff seeks to introduce 55 separate "1241 Reports" regarding customer complaints regarding alleged unlatching of seat belts during a collision. Sixteen of the 1241 Reports concern customer complaints involving a vehicle with a body similar to the Guilds' Cutlass and installed with the same type of seat belt system as the Guild's automobile. GM seeks to preclude plaintiff from introducing any of the 1241 reports because there is no way of confirming that the incidents described in the 1241 reports were substantially similar to the collision involving the Guild vehicle.

None of the 1241 reports may be received at trial as evidence of a defect because they constitute inadmissible hearsay. However, assuming a proper foundation is established, and assuming GM actually contests the issue of notice of consumer allegations of seatbelt unlatching,[3] the six-teen 1241 reports involving a car and seat belt system substantially similar to plaintiff's vehicle may be admissible for the non-hearsay purpose of demonstrating notice.

■■ *4. GM's Motion to Exclude Evidence Pursuant to Daubert:* In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that Rule 702 of the Federal Rules of Evidence assigns the trial judge the task of ensuring at the outset that any and all scientific testimony or evidence admitted is not only relevant but reliable. *Daubert*'s general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, ——, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

In determining scientific knowledge, initial inquiries must be made into whether the reasoning or methodology behind the testimony is scientifically valid and whether the reasoning or methodology can be applied to the facts in issue. In *Daubert,* the Supreme Court set out a partial list of factors that trial judges are to look to in making these determinations, but this list of specific factors is neither necessary nor exclusively applicable to all experts or in every case. *Kumho,* 526 U.S. at ——, 119 S.Ct. at 1171. "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one... The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786.

---

to, but do not mirror, the actual conditions involved").

2. As to the sled tests, this Court will revisit the issue of their admissibility after counsel confer on whether any of the sled test results depict potential inertial unlatching of the belt buckle.

3. The 1992 NHTSA report which GM will offer into evidence refers to consumer complaints of belt unlatching and specifically notes that GM informed NHTSA that it had received a "few reports alleging inertial unlatching of seat belt buckles."

GM has moved to preclude plaintiff's experts, Dr. James Pugh and Dr. Malcolm Newman, from testifying at trial on the grounds that their testimony is neither scientifically valid nor reliable. For the reasons set forth below, their motion is denied.

In the first instance, plaintiff's experts are qualified in the field for which plaintiff offers their expertise. Dr. Pugh holds a Ph.D in Biomedical Engineering and a Bachelor of Science in Metallurgy and Materials from Massachusetts Institute of Technology, and is currently the director of Biomedical Engineering, Metallurgy, and Materials Science of Inter–City Testing and Consulting Corporation. Dr. Newman holds degrees in Civil Engineering from the City College of New York and Columbia University, and an Engineering Science degree from New York University. Dr. Newman is the President and Consulting Engineer of Biomedical Engineering, Metallurgy, and Materials Science of Inter–City Testing and Consulting Corporation. Both experts have published a variety of technical articles in engineering and scientific journals and have served as experts in a number of other lawsuits.

Second, the theory of "inertial release" is not a novel theory which was developed by plaintiff's experts. Rather, it is based on a scientific phenomenon which has its groundings in principles of science and of physics and has formed the basis for a number of studies and tests, including extensive testing by NHTSA and testing by GM itself.

Third, although defendant places a great deal of emphasis on plaintiff's experts' reliance on the so-called "slap test," this test does not form the entire basis of plaintiff's experts' opinions. This test is merely but one of many factors upon which the expert opinions are based. Dr. Pugh indicates in his report that he reviewed deposition testimony, medical records, medical images, witness statements, reports, and copies of photographs depicting the Guild vehicle at the time of the occurrence and those showing the contusive damage to Ms. Guild's body. Dr. Pugh also inspected the Guild vehicle, the accident scene and met with the Guild family. Dr. Newman similarly reviewed deposition testimony, witness statements, reports and copies of photos depicting the vehicle driven by Ms. Guild at the time of the occurrence and had discussions with Dr. Pugh concerning his analysis and evaluation of this matter.

Finally, plaintiff has indicated that both experts opinions were based upon engineering drawings and specifications for plaintiff's vehicle as well as the Kappell vehicle, findings made by George Scardetta, P.E., with regard to the force required to activate seat belt push button release mechanism on the subject vehicle, several U.S. Patents, the slap test, and information provided during discovery by GM including: "N" and "H" car crash test information, frontal impact sled tests, GM memoranda, and prior customer complaints of buckle unlatching, including the "1241 reports."

Although defendant questions plaintiff's experts' methodologies and cites to a number of studies and reports which conclude that inertial release does not occur in "real world" accidents, the mere fact that a difference of opinion exists does not make plaintiff's experts' conclusions inherently unreliable. Such differences of opinion and alleged weaknesses in the experts' methodologies will go to the weight to be given the expert testimony, not its admissibility. *See Lappe v. American Honda Motor Co.*, 857 F.Supp. 222, 228 (N.D.N.Y. 1994) (that expert may have neglected to perform some "essential" tests goes to weight of testimony, not admissibility). As the Second Circuit cautioned in *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir.1995), trial judges acting as gatekeepers under *Daubert* must not assume "the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul" and thereby usurp "the ageless role of the

jury" in evaluating witness credibility and weight of the evidence.

There is sufficient evidence in the record before this Court to indicate that plaintiff's experts have extensive experience and education in the fields in which they propose to testify about. Further, this Court finds that there is a reasonable basis to believe that their testimony would be helpful to the jury in assessing plaintiff's allegations against GM. Consequently, GM's motion to preclude Dr. Pugh and Dr. Newman from testifying at trial is denied.

■ 5. *Admissibility of the So Called "Slap Test"*: GM anticipates that plaintiff will ask one of its experts to conduct a slap test of a seat belt buckle to demonstrate the principle of inertial unlatching. The slap test apparently involves striking the back of a belt buckle with a stiff object or a knee or hip thereby causing the buckle to unlatch. GM contends the slap test is nothing more that a "parlor trick" and does not represent "real world crash conditions." Accordingly, GM seeks to preclude plaintiff from demonstrating the slap test during the trial. Plaintiff represents that she does not seek to use the "slap test" as evidence of a defect, but rather as an in court demonstration of the scientific principles involved with inertial release.

■ Given the description of the "slap test" provided by counsel, there appears to be little danger that the jury would confuse the demonstration as a simulation of the actual crash at issue. Rather, with proper limiting instructions, the jury will understand that the demonstration is being offered simply to illustrate the principles of science involved in inertial unlatching. Experiments or demonstrations designed to illustrate general scientific principles relied upon by expert witnesses are admissible for that limited purpose. *See Harkins v. Ford Motor Co.*, 437 F.2d 276, 278 (3rd Cir.1970) (no error for jury to view experiments that were merely demonstrations designed to graphically depict general principles of physics); *Ri-*

*mac v. Nissan Motor Corp.*, 1986 WL 1838 (N.D.Ill. January 23, 1986) (where plaintiff's demonstrations were intended to "demonstrate the effect of an impact of a given force" and were not purported to be a reconstruction of the accident, demonstration admissible). This Court will allow the "slap test" to be demonstrated to the jury, but will also provide an appropriate limiting instruction. *See Robinson v. Audi Nsu Auto Union*, 739 F.2d 1481, 1484 (10th Cir.1984) (where experiments do not simulate actual events at issue, jury should be instructed that evidence is admitted for a limited purpose).

### Conclusion

For the foregoing reasons, the parties motions in limine have been **granted in part** and **denied in part**. Jury selection shall commence at 9:30 a.m. on June 2, 1999.

**SO ORDERED.**